FOERDERER v. MOORS et al.

(Circuit Court of Appeals, Third Circuit.   December 28, 1898.)

No. 24.

**1. GUARANTY—CONSTRUCTION OF CONTRACT.**

Plaintiffs issued a letter of credit to K. S. Co. authorizing it to make drafts on London bankers in payment of the invoice price of merchandise "to be shipped" to American ports, taking an agreement from K. S. Co. at the same time to protect and secure the payment of the drafts, on which agreement defendant became guarantor. *Held*, that drafts made under such letter of credit, in payment for merchandise which had been purchased and shipped for an American port some three weeks before the letter was issued or the contract executed, were not within the terms of the guaranty.

**2. SAME—MISUSE OF CONTRACT BY PRINCIPAL.**

A guarantor of the payment of drafts made under a letter of credit cannot be held liable for drafts drawn and paid thereunder, but which were not within its terms, on the ground of a misuse of the letter by his principal, where bills of lading attached to such drafts advised all parties to whom they came of the purpose for which they were made, which was one not authorized by the letter of credit.

**8. SAME—DISCHARGE OF GUARANTOR—RELEASE OF SECURITY.**

Where a contract gives one party a specific lien on property to secure its performance by the other, a guarantor on behalf of the second party is entitled to the benefit of such security; and, if it is surrendered without his consent, he is discharged from liability.

**4. SAME—CONSTRUCTION OF CONTRACT.**

In a provision of a guaranty authorizing the obligees to grant the principal "such favors, by way of extension, renewal, and otherwise," as they might deem expedient, the word "otherwise" is confined in meaning to favors of a like kind, with extensions and renewals, and does not authorize the surrender of security expressly pledged by the contract, particularly where the terms on which such security might be surrendered were specifically stated in further provisions of the guaranty.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

John G. Johnson, for plaintiff in error.

Joseph De F. Junkin, for defendant in error.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPATRICK, District Judge.

ACHESON, Circuit Judge.   Upon the application of Keen-Sutterle Company, general importer of skins, wools, etc., J. B. Moors & Co., plaintiffs below (the defendants in error), bankers in Boston, issued their letter of credit, dated November 7, 1895, addressed to Suffert, Von Laer & Co., London, authorizing them to draw on Morton, Rose & Co., bankers in London, at four months date, for any sum or sums, not exceeding in all £15,000 sterling, for account of Keen-Sutterle Company, the "drafts, with advice thereof to Messrs. Morton, Rose & Co., to be drawn in Europe, and negotiated prior to May 1, 1896, for the invoice cost of merchandise to be shipped to the port of Boston, New York, Philadelphia, or Wilmington, in the United States, or Montreal, Canada, and to be accompanied by consular invoice and bills of lading to our order; one copy to be sent us direct by vessel or mail."

Contemporaneously with the giving of this letter of credit, Keen-Sutterle Company entered into an agreement with J. B. Moors & Co., embodied in a letter from the former to the latter, dated November 7, 1895, and indorsed on a copy of the letter of credit, containing the following stipulation:

"Having received from you the letter of credit No. 4,725, on our account, of which a true copy is on the other side, we hereby agree to its terms. and, in consideration thereof, bind ourselves to furnish you, fifteen days before the maturity of the acceptances under it, with first-class bankers' bills of exchange, for the same account, at not exceeding sixty days' sight, on or payable in London, and bearing our indorsement, or to pay the equivalent thereof in cash at the current rate of exchange for first-class demand or sixty days' sight bankers' bills."

"We hereby pledge to you, also hereby giving you a specific claim and lien thereon, all merchandise, and the proceeds thereof, for which you may have paid, or come under any engagement by reason of this credit, also all bills of lading and all policies of insurance, with full power and authority for you to take possession of and sell the same, or any part of same, at your discretion, for your security or reimbursement; and to charge same with all expenses, together with your commission for sale or guaranty."

"Any security which may be held by you hereunder may be held and applied by you to secure also any other indebtedness or liability existing, or which may hereafter exist. from us to you: and we further agree to give you any additional security that you may require."

"Any goods imported under this or any other credit issued by you for our account, or their proceeds, whether the draft against same shall have been paid or not, or whether the goods shall have been delivered to us or not, may be held by you as general collateral security for our account with you, upon the terms and conditions herein contained."

At the request and for the accommodation of Keen-Sutterle Company, Robert H. Foerderer, defendant below (the plaintiff in error), became the guarantor of performance by Keen-Sutterle Company of its agreement with J. B. Moors & Co. The guaranty was in the form of a letter attached to the agreement between Keen-Sutterle Company and J. B. Moors & Co., and bore even date therewith. The following is a copy of the guaranty.

"Boston, Nov. 7th, 1895.

"J. B. Moors & Co., Boston—Dear Sirs: In consideration of the sum of one dollar, to me in hand paid by you, the receipt whereof is hereby acknowledged, I do hereby guaranty, promise, and agree, to and with you, that the within-named Keen-Sutterle Co., of Philadelphia, will well and faithfully perform and fulfill everything by the foregoing agreement on their part and behalf to be performed and fulfilled, at the times and in the manner therein provided. And I consent that you may, in your discretion, afford said Keen-Sutterle Co. such favors, by way of extension, renewal, and otherwise, as you may deem expedient; and I agree generally to hold you harmless against any and all loss, damage, cost, expense, and commissions which may happen or accrue in consequence of or upon said letter of credit or agreement, or the extension or renewal thereof. When deemed expedient by you, I hereby authorize you to deliver to said Keen-Sutterle Co. any or all merchandise, or the documents applicable to same, under said letter of credit, upon their agreeing either to store said merchandise in your name, or to hand you the proceeds of same (identical or otherwise), or to deliver said merchandise to purchasers, with instructions to make settlement with you direct; and with the further understanding on my part that in the event of their failure so to do, or in the event of your not receiving said settlement, that I am not in any way released from any of the foregoing obligations on my part to be kept or performed. And I do hereby expressly waive and dispense with any demand upon the said Keen-Sutterle Co., and any notice of any nonperformance on their part,

holding myself liable to you, under said agreement and the letter of credit named in said agreement, equally with said Keen-Sutterle Co. in all respects.

"Robert H. Foerderer."

From the record it appears that in July and August, 1895, Keen-Sutterle Company had ordered a quantity of wool from Suffert, Von Laer & Co. This wool was all put on board the ship Nahum Chapin, lying in Algoa Bay, South Africa, in the month of October, 1895, prior to the 15th of that month; and three different bills of lading therefor, each covering part of the wool, dated, respectively, October 5, 12, and 14, 1895, were issued to Reiners, Von Laer & Co. These bills of lading were indorsed by Reiners, Von Laer & Co., and sent to Suffert, Von Laer & Co., in London. The Nahum Chapin, laden with this wool, sailed from Algoa Bay on October 15, 1895, on a direct voyage to Philadelphia. Suffert, Von Laer & Co., acting under the recited letter of credit, drew three drafts on Morton, Rose & Co. for the invoice cost of this wool, each draft being accompanied by one of the said bills of lading, indorsed to the order of J. B. Moors & Co. The drafts respectively bore date November 11, 18, and 26, 1895, and matured March 14, March 21, and March 29, 1896. Together they amounted, in United States money, to $58,759.02. They were accepted by Morton, Rose & Co., who gave due notice thereof to J. B. Moors & Co., and forwarded to them the bills of lading. The Nahum Chapin, with the cargo of wool, arrived at Philadelphia on December 14, 1895. Before the arrival of the vessel, all the bills of lading had been received by J. B. Moors & Co., and by them had been delivered to Keen-Sutterle Company upon "trust receipts." Keen-Sutterle Company thus obtained possession of the wool, and sold it, appropriating the proceeds to itself. This company failed, and was put into the hands of a receiver on January 9, 1896.

This suit was brought by J. B. Moors & Co. against Robert H. Foerderer upon his guaranty, to recover the loss sustained by the plaintiffs on the three drafts accepted by Morton, Rose & Co., and paid with funds of the plaintiffs. There was a verdict in favor of the plaintiffs for $56,483.03, subject to the opinion of the court upon questions of law reserved. These questions the court decided in favor of the plaintiffs, and, accordingly entered judgment on the verdict against the defendant.

The reserved question we will first take up is whether the defendant was responsible for drafts drawn for the invoice cost of merchandise which was actually shipped in a vessel in Algoa Bay, destined to Philadelphia, prior to November, 1895; the ship containing the merchandise having started on a direct voyage from Algoa Bay to Philadelphia, antecedently to the month of November, 1895. The answer to this question is to be sought in the three papers of November 7, 1895,—the letter of credit, the agreement between the plaintiffs and Keen-Sutterle Company, and the guaranty,—considered together. The terms of these papers fix the rights of the parties. There is no evidence of any usage which might affect the construction of the writings. It does not appear that the parties contracted with reference to this particular importation; nor is it shown that the defendant, when he signed the guaranty, had any connection whatever with this wool, or

any knowledge of the purchase of it by Keen-Sutterle Company. The defendant's written engagement furnishes the measure of his responsibility. Now, the language used throughout these papers refers wholly to future transactions. There is no suggestion of shipments previously made. All the terms employed are prospective. The drafts authorized by the letter of credit, and hence the drafts coming within the defendant's guaranty, were to be drawn "for the invoice cost of merchandise to be shipped to the port of * * *, Philadelphia." These words, it seems to us, exclude merchandise which had been shipped already. Had the parties meant past as well as future shipments, nothing would have been easier than to say "merchandise shipped or to be shipped." Why the parties named one class of shipments, and not the other, we need not inquire. It is enough that they did so. The parties having stipulated in respect to "merchandise to be shipped," we must assume that they used the words in their ordinary sense. Having specified shipments to be made, we are not at liberty to read into their contract antecedent shipments. Time of shipment was of the essence of this contract, and it is our duty to adhere to the terms the parties have used. Bowes v. Shand, 2 App. Cas. 455; Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12.

Not only was this wool put on board the ship Nahum Chapin before October 15, 1895, but on that day the vessel sailed from Algoa Bay directly to Philadelphia. The parties to the papers of November 7, 1895, did not describe, and, we think, did not contemplate, merchandise so circumstanced. Their language was not merchandise "to be brought," but merchandise "to be shipped," to the port of Philadelphia. Giving these latter words their natural meaning, the defendant cannot be made to pay drafts drawn on account of merchandise shipped antecedently to the letter of credit, and which had been out at sea on the voyage to Philadelphia for the space of three weeks before the guaranty was given.

The argument that if the true construction of the papers of November 7, 1895, be as above indicated, yet the defendant is liable because of misuse of the letter of credit, is more specious than sound. The defendant's guaranty of drafts was specific. He undertook to be responsible as respects designated drafts only. Moreover, the plaintiffs' London bankers should have been advised of the terms of the letter of credit. Presumably they were. Now, the bills of lading admonished them that, three weeks before the date of the letter of credit, this wool had been shipped on the Nahum Chapin, bound for Philadelphia. The plaintiffs themselves had the like information from the bills of lading, which perfectly protected them, but which they voluntarily surrendered to Keen-Sutterle Company without conference with the defendant.

The other reserved questions relate to the form of the trust receipts which the plaintiffs took from Keen-Sutterle Company, upon the delivery to that company of the bills of lading, and the secret understanding which existed between the plaintiffs and Keen-Sutterle Company upon which they acted.

The defendant's guaranty, as we have seen, contained the following clause:

"When deemed expedient by you, I authorize you to deliver to said Keen-Sutterle Co. any or all merchandise, or the documents applicable to the same, under said letter of credit, upon their agreeing either to store said merchandise in your name, or to hand you the proceeds of same (identical or otherwise), or to deliver said merchandise to purchasers with instructions to make settlement with you direct; and with the further understanding on my part that in the event of their failure so to do, or in the event of your not receiving said settlement, that I am not in any way released from any of the foregoing obligations on my part to be kept or performed."

Now, it may be that this clause would have warranted the delivery of the bills of lading to Keen-Sutterle Company upon the trust receipts given, if those receipts had embodied the entire agreement between Keen-Sutterle Company and the plaintiffs. The fact, however, was otherwise. It appears that the obligation to deliver to the plaintiffs the proceeds of sale of the merchandise as soon as received by Keen-Sutterle Company was waived by agreement. There was a distinct understanding, not communicated to the defendant, between the plaintiffs and Keen-Sutterle Company, upon which they acted, that the proceeds of the sales of merchandise were not to be handed to the plaintiffs as soon as received, or handed to the plaintiffs at all, but that Keen-Sutterle Company should collect the proceeds, and use the money, and put the plaintiffs in funds to meet the acceptances 15 days before maturity of the drafts. Upon this private understanding, the bills of lading for this wool were delivered by the plaintiffs to Keen-Sutterle Company. As already stated, Keen-Sutterle Company sold the wool, received and kept the proceeds, and the loss (which must be borne by one or other of the parties to this suit) ensued. Whether the defendant was released from his liability by reason of this secret agreement and the action under it we are now to determine.

By the terms of the papers of November 7, 1895, the drafts under the letter of credit were to be accompanied by consular invoice and bills of lading to the plaintiffs' order; and, by express stipulation, the merchandise and the proceeds thereof and the bills of lading were specifically pledged to the plaintiffs for their security against the drafts. The defendant was a guarantor, and, as such, undoubtedly entitled to the benefit of this security. The argument to the contrary finds no solid support in the papers of November 7, 1895, when read as a whole, as they must be. The final clause of the guaranty was not intended to turn the defendant into a principal, and had no such effect. It waived demand and notice, and made him liable as upon a contract of strict suretyship, but it did not deprive him of the benefit of a previous provision which recognized and conserved his rights. Without his own consent, his rights in the security the plaintiffs held could not be abridged. What consent he gave, the guaranty itself discloses. In addition to what has been recited, it states:

"And I consent that you may, in your discretion, afford said Keen-Sutterle Co. such favors, by way of extension, renewal, and otherwise, as you may deem expedient; and I agree generally to hold you harmless against any and all loss, damage, cost, expense, and commissions which may happen or accrue in consequence of or upon said letter of credit or agreement, or the extension or renewal thereof."

According to the accepted rule of construction, the favors to be afforded under the word "otherwise" would be of like kind with exten-

sions.and renewals. Most certainly, the plaintiffs were not thereby authorized to surrender the bills of lading or deliver the merchandise to Keen-Sutterle Company, for the clause in the guaranty immediately following (quoted at large above) defines precisely what the plaintiffs might do in that regard. They were authorized to deliver the merchandise, or the documents applicable thereto, to Keen-Sutterle Company, upon that company's agreeing to store the merchandise in the plaintiffs' name, or to hand the plaintiffs the proceeds (identical or otherwise), or to deliver the merchandise to purchasers, with instructions to make settlement directly with the plaintiffs. The agreement under which the bills of lading for the wool were delivered secured none of these things. Keen-Sutterle Company was not to hand the proceeds to the plaintiffs, but was allowed to retain and use them, and was bound only to provide funds to meet the drafts at or near maturity. The defendant's security was thus wholly lost. In lieu of an immediate claim to the proceeds of sale was substituted the naked engagement of Keen-Sutterle Company to pay the amount in the distant future. The departure from what was authorized was material and prejudicial to the defendant, as the event demonstrated.

We are of opinion that the court below should have given judgment for the defendant upon the reserved questions of law arising upon the defendant's first and third points and stipulation filed therewith. The judgment of the circuit court is therefore reversed, and the cause is remanded to that court, with direction to enter judgment in favor of the defendant below, in accordance with the foregoing opinion, non obstante veredicto.